Case No. 22-55731

_____

UNITED STATES COURT OF APPEALS
FOR THE NINTH CIRCUIT
_____

**LORENZO DOMINGUEZ, individually, on behalf of others
similarly situated, and on behalf of the general public**

*Plaintiff-Appellee*

v.

**BETTER MORTGAGE CORPORATION**

*Defendant-Appellant.*

On Appeal from the United States District Court, Central District of
California, Case No. 8:20-cv-01784-JLS-KES
The Honorable Josephine L. Staton, District Judge

_____

**PLAINTIFF-APPELLEE'S ANSWERING BRIEF**
_____

Matthew C. Helland
Daniel S. Brome
NICHOLS KASTER, LLP
235 Montgomery St., Suite 810
San Francisco, CA 94104
Telephone: (415) 277-7235
Facsimile: (415) 277-7238

C. Andrew Head
Bethany Hilbert
HEAD LAW FIRM, LLC
4422 N. Ravenswood Ave.
Chicago, IL 60640
Telephone: (404) 924-4151
Facsimile: (404) 796-7338

*Attorneys for Plaintiff-Appellee,
Lorenzo Dominguez*

**REDACTED**

## <u>TABLE OF CONTENTS</u>

INTRODUCTION ..................................................................................... 1

STATEMEMENT OF JURISDICTION ..................................................... 3

STATEMENT OF ISSUES ...................................................................... 17

STATEMENT OF THE CASE ................................................................. 18

    I.    PROCEDURAL HISTORY ................................................... 18

    II.   FACTUAL BACKGROUND .................................................. 20

        A. Better's Blitz in Response to Suit .................................. 20

        B. The Employment Agreement: Forced Arbitration and
            Class/Collective Waivers ................................................. 24

        C. The Release Agreement .................................................. 25

        D. The Recap Email ............................................................ 28

        E. The Signature Blitz ........................................................ 29

SUMMARY OF ARGUMENT .................................................................. 31

ARGUMENT .......................................................................................... 33

    I.    STANDARD OF REVIEW ................................................... 33

    II.   THE DISTRICT COURT HAS BROAD DISCRETION AND
        AUTHORITY TO CONTROL COMMUNICATIONS AND
        INVALDIATE RESULTING AGREEMENTS .......................... 34

        A. District Courts Have the Duty and Authority Under Rule
            23(d) to Control Pre-Certification Communications with
            Putative Class Members. ................................................. 37

B. District Courts Have the Duty and Authority, as Recognized in Hoffman La-Roche, to Control Pre-Certification Communications with Putative Members of a Collective Action ................................................................................... 38

C. District Courts' Duty and Authority to Control Communications Includes the Right to Invalidate Settlement Agreements .............................................................................. 42

    i.    Rule 23 grants district courts the power to invalidate settlement agreements ................................................. 42

    ii.    The FLSA grants district courts the power to invalidate settlement agreements. ............................. 50

D. District Courts' Duty and Authority to Control Communications Includes the Right to Invalidate Post-Suit Arbitration Agreements. ........................................................ 52

III.    THE DISTRICT COURT DID NOT ABUSE ITS DISCRETION BY INVALIDATING AGREEMENTS RESULTING FROM BETTER'S BLITZ ................................................................... 54

A. The Public Policies Behind Rule 23 and the FLSA Support the District Court's Orders. ................................................. 54

B. The District Court did not Abuse its Discretion in Invalidating Some (But Not All) Arbitration Agreements ... 58

C. The District Court did not Abuse its Discretion in Invalidating the Release Agreements. ................................. 62

D. The District Court did not Abuse its Discretion in Ordering Better to Seek Approval of Communications to Putative Class and Collective Members. ............................................ 66

CONCLUSION ......................................................................... 68

STATEMENT OF RELATED CASES .................................................... 70

CERTIFICATE OF COMPLIANCE ....................................................... 71

# <u>TABLE OF AUTHORITIES</u>

## <u>CASES</u>

*Abdallah v. Coca-Cola Co.,* 186 F.R.D. 672 (N.D. Ga. 1999) .................. 59

*Allen v. Bedolla*, 787 F.3d 1218 (9th Cir. 2015) ..................................... 55

*Andrews v. City of Henderson*, 35 F.4th 710 (9th Cir. 2022) ................. 13

*Balasanyan v. Nordstrom, Inc.,*

      2012 WL 760566 (S.D. Cal. Mar. 8, 2012) ......................... 53, 54, 56

*Baldwin v. Redwood City*, 540 F.2d 1360 (9th Cir. 1976) ...................... 11

*Barrentine v. Arkansas-Best Freight Sys., Inc.*, 450 U.S. 728 (1981) ..... 50

*Belt v. Emcare Inc.*, 299 F. Supp. 2d 664 (E.D. Tex. 2003) .................... 59

*Billingsley v. Citi Trends, Inc.*, 560 F. App'x 914 (11th Cir. 2014) ........ 41

*Bublitz v. E.I. duPont de Nemours and Co.,*

      196 F.R.D. 545 (S.D. Iowa 2000) .................................................... 59

*Burrell v. Crown Cent. Petroleum, Inc.,*

      176 F.R.D. 243 (E.D. Tex. 1997) .................................................... 38

*Campbell v. City of Los Angeles*, 903 F.3d 1090 (9th Cir. 2018). ........... 40

*Chamber of Com. of United States v. Bonta,*

      13 F.4th 766 (9th Cir. 2021) ........................................................... 24

*Chamber of Com. of United States v. Bonta,*

    13 F.4th 1113 (9th Cir. 2022) ........................................................... 24

*Churchill Vill., L.L.C. v. Gen. Elec.,*

    361 F.3d 566 (9th Cir. 2004). ................................................... 44, 45

*Cobell v. Kempthorne.,* 455 F.3d 317 (D.C. Cir. 2006) ........................... 47

*Cobell v. Norton*, 212 F.R.D. 14 (D.D.C. 2002). ...................................... 48

*Coffin v. Bowater Inc.*, 224 F.R.D. 524 (D. Me. 2004) ............................. 48

*Cole v. U.S. Dist. Ct. For Dist. of Idaho,*

    366 F.3d 813 (9th Cir. 2004) ......................................................... 16

*Coles v. Marsh*, 560 F.2d 186 (3d Cir. 1977) ............................... 54, 55, 56

*Cunningham v. Gates*, 229 F.3d 1271 (9th Cir. 2000) ............................ 14

*Damassia v. Duane Reade, Inc.*, 250 F.R.D. 152 (S.D.N.Y. 2008) .......... 59

*Degen v. United States*, 517 U.S. 820 (1996). ........................................ 34

*Doe v. Regents of Univ. of Cal.*, 891 F.3d 1147 (9th Cir. 2018) ........ 11, 13

*Dunn v. Tchrs. Ins. & Annuity Ass'n of Am.,*

    2016 WL 153266 (N.D. Cal. Jan. 13, 2016) .................................. 51

*Fox v. Saginaw Cnty., Michigan,*

    35 F.4th 1042 (6th Cir. 2022) ........................................... 1, 6, 33, 49

*Friedman v. Intervet Inc.*, 730 F. Supp. 2d 758 (N.D. Ohio 2010) .......... 38

vi

*Glass v. FMM Enterprises, Inc.*, 755 F. App'x 700 (9th Cir. 2019)...........7

*Gon v. First State Ins. Co.*, 871 F.2d 863 (9th Cir. 1989) ..................9, 12

*Guifu Li v. A Perfect Day Franchise, Inc.*,

    270 F.R.D. 509 (N.D. Cal. Sept. 29, 2010). .......................46, 47, 58

*Gulf Oil Co. v. Bernard*, 452 U.S. 89 (1981) ..................................*passim*

*Hampton Hardware, Inc. v. Cotter & Co., Inc.*,

    156 F.R.D. 630 (N.D. Tex. 1994) ....................................................59

*Hanlon v. Chrysler Corp.*, 150 F.3d 1011 (9th Cir. 1998).......................35

*Haralson v. U.S. Aviation Servs. Corp.*,

    383 F. Supp. 3d 959 (N.D. Cal. 2019) ...........................................44

*Hoffmann-La Roche Inc. v. Sperling*, 493 U.S. 165 (1989)............*passim*

*Hook v. Arizona Dept. of Corrections*,

    107 F.3d 1397 (9th Cir. 1997) ...........................................9, 10, 11

*Hunt v. VEP Healthcare, Inc.*,

    2017 WL 3608297 (N.D. Cal. Aug. 22, 2017) ................................45

*Idaho Watersheds Project v. Hahn*, 307 F.3d 815 (9th Cir. 2002) ....11, 12

*In re Baldwin-United Corp. (Single Premium Deferred Annuities Ins.*

    *Litig.),* 770 F.2d 328 (2d Cir. 1985). ...............................................48

*In re Bluetooth Headset Prod. Liab. Litig.*,

654 F.3d 935 (9th Cir. 2011) .......................................................... 34

*In re Currency Conversion Fee Antitrust Litig.,*

    224 F.R.D. 555 (S.D.N.Y. 2004) ..................................................... 53

*In re Victor Techs. Sec. Litig.*, 792 F.2d 862 (9th Cir. 1986) ................. 37

*In re Yahoo! Inc. Customer Data Sec. Breach Litig.,*

    2019 WL 387322 (N.D. Cal. Jan. 30, 2019) ................................... 46

*Johnson v. Serenity Transportation, Inc.,*

2017 WL 4236798 (N.D. Cal. Sept. 25, 2017) ......................................... 47

*K.H. v. Sec'y of Dep't of Homeland Sec.,*

    2018 WL 3585142 (N.D. Cal. July 26, 2018) ................................. 51

*Kasten v. Saint-Gobain Performance Plastics Corp.,*

    563 U.S. 1 (2011) ........................................................................... 57

*Kerr v. U. S. Dist. Ct. for N. Dist. of California*, 426 U.S. 394 (1976).... 15

*Lynn's Food Stores, Inc. v. United States*,

    679 F.2d 1350 (11th Cir. 1982) ......................................... 36, 50, 51

*McKee v. Audible, Inc.,*

    2018 WL 2422582 (C.D. Cal. Apr. 6, 2018)................. 46, 53, 54, 56

*McKeen-Chaplin v. Provident Sav. Bank, FSB,*

    862 F.3d 847 (9th Cir. 2017) .......................................................... 64

*Meredith v. Oregon*, 321 F.3d 807 (9th Cir. 2003)). ................................ 13

*Mitchell v. Robert DeMario Jewelry, Inc.*, 361 U.S. 288 (1960) .............. 56

*Mullen v. Treasure Chest Casino, LLC*, 186 F.3d 620 (5th Cir. 1999) ... 59

*Phillips ex rel. Ests. of Byrd v. Gen. Motors Corp.*,

    307 F.3d 1206 (9th Cir. 2002) .................................................. 42, 43

*Pub. Citizen v. Liggett Grp., Inc.*, 858 F.2d 775 (1st Cir. 1988) ............. 42

*Puente Ariz. v. Arpaio*, 821 F.3d 1098 (9th Cir. 2016)) .......................... 13

*Radcliffe v. Hernandez*, 818 F.3d 537 (9th Cir. 2016). ............... 36, 43, 55

*Radcliffe v. Transunion, LLC*, 419 F. App'x 768 (9th Cir. 2011) ............. 7

*Rees v. Souza's Milk Transp., Co.*,

    2006 WL 738987 (E.D. Cal. Mar. 22, 2006) ................................... 58

*Rodriguez v. W. Publ'g Corp.*, 563 F.3d 948 (9th Cir. 2009) .................. 45

*Rutti v. Lojack Corp.*,

    2012 WL 3151077 (C.D. Cal. July 31, 2012) ............................ 57, 58

*Self-Realization Fellowship Church v. Ananda Church of Self*

    *Realization,* 59 F.3d 902 (9th Cir. 1995) ....................................... *12*

*Seminiano v. Xyris Enter., Inc.*, 602 F. App'x 682 (9th Cir. 2015) ......... 50

*Sierra On-Line, Inc. v. Phoenix Software, Inc.*,

    739 F.2d 1415 (9th Cir. 1984). ................................................... 4, 9

ix

*Slavkov v. Fast Water Heater Partners I, LP*,

    2015 WL 6674575 (N.D. Cal. Nov. 2, 2015) ................................... 47

*Smith v. Kaiser Found. Hosps.*,

    2020 WL 5064282 (S.D. Cal. Aug. 26, 2020)................................. 51

*States v. Tillman*, 756 F.3d 1144 (9th Cir. 2014). ........................... 13, 14

*Staton v. Boeing Co.*, 327 F.3d 938 (9th Cir. 2003). ............................. 55

*Torres v. Gristede's Operating Corp.*, 519 F. App'x 1 (2d Cir. 2013) ...... 34

*TransWorld Airlines, Inc. v. Am. Coupon Exch., Inc.*,

    913 F.2d 676 (9th Cir. 1990) .......................................................... 12

*Twegbe v. Pharmaca Integrative Pharmacy, Inc.*,

    2013 WL 3802807 (N.D. Cal. July 17, 2013) ................................. 58

*United States v. Gila Valley Irrigation Dist.*,

    345 F. App'x 281 (9th Cir. 2009) .................................................... 11

*United States v. Oakland Cannabis Buyers' Coop.*,

    190 F.3d 1109 (9th Cir. 1999). ....................................................... 14

*Valdez v. Neil Jones Food Co.*,

    2016 WL 4247911 (E.D. Cal. Aug. 10, 2016) ................................. 45

*Van Bronkhorst v. Safeco Corp.*, 529 F.2d 943 (9th Cir. 1976) ........ 33, 34

x

*Watkins v. Healy*, 986 F.3d 648 (6th Cir. 2021)......................................... 15

*Williams v. Securitas Sec. Servs. USA, Inc.*,

    10-7181 WL 2713741 (E.D. Pa. July 13, 2011) .............................. 53

## STATUTES & RULES

28 U.S.C. § 1291 ........................................................................... 4

28 U.S.C. § 1292(a)(1) ................................................................. 12

28 U.S.C. §§ 2072 ....................................................................... 34

28 U.S.C. §§ 2075 ....................................................................... 34

Fed. R. App. P. 4. .......................................................................... 4

Fed. R. App. P. 4(a)(5). ............................................................... 43

Fed. R. Civ. P. 23 ................................................................... 35, 37

Fed. R. Civ. P. 23(d) ................................................................... 35

Fed. R. Civ. P. 23(d)(1). .............................................................. 37

Fed. R. Civ. P. 23(d)(1)(B) ......................................................... 35

Fed. R. Civ. P. 23(e). ................................................................... 44

Fed. R. Civ. P. 16(b)(4) ............................................................... 43

Fed. R. Civ. P. 83(b)..................................................................... 34

"The district court has the authority to protect the class-action

process. That is what it did here."

*Fox v. Saginaw Cnty., Michigan*, 35 F.4th 1042, 1051 (6th Cir. 2022).

## <u>INTRODUCTION</u>

Defendant and Appellant Better Mortgage Corporation ("Better")

asks this Court to review two interlocutory case management orders,

one of which it failed to timely appeal, in an effort to overturn the

district court's exercise of its broad case management authority. The

Court should reject this appeal for lack of jurisdiction.

The jurisdictional failings here are many. Better failed to timely

appeal the district court's May 17 Order, which contains all of the

substantive rulings Better challenges on appeal. Better argues the May

17 Order merges into the July 21 Order, but a party cannot reopen the

appeal window after it closes by asking the district court to revisit a

prior ruling and then appealing from the resulting order. And even if

that strategy were permissible, Better did not ask the district court to

reconsider, modify, or amend its May 17 Order. Instead, the July 21

Order resulted from the parties' joint submission regarding the form

and content of curative notice to be issued to putative class and collective members.

Better filed a timely notice of appeal from the July 21 Order, but there is no appellate jurisdiction over that interlocutory order, which merely affirmed the contents and scope of the May 21 Order without issuing any new injunctions or restrictions on speech. Since there is no basis for the Court to review the July 21 Order, it matters not whether that order is "inextricably intertwined" with the May 17 Order. And even if the July 21 Order announced a new restriction on speech, that presents a distinct issue this Court could review without determining the propriety of the district court's other case management orders. As such, there is no pendent appellate jurisdiction over the May 21 Order.

If the Court determines it has jurisdiction to review one or both of the interlocutory orders, it should do so with great deference to the district court's broad discretion to manage the litigation before it. The Supreme Court has recognized that district courts have the duty and authority to control communications in Rule 23 class actions and in Fair Labor Standards Act ("FLSA") collective actions—including the duty and authority to invalidate settlement agreements. District courts also

2

have the authority to invalidate arbitration agreements resulting from coercive and misleading communications, which is no different than district courts' authority to invalidate other agreements between parties affecting the scope and course of litigation.

In reviewing the district court's case management orders for abuse of discretion, the question is not whether this Court would have reached the same result, but rather whether the district court acted within its authority based on the record before it. And the answer to that question is "yes." The record shows that Better's post-suit signature blitz was coercive, confusing, and aimed solely at cutting off this litigation before the court could take control of the case, and before putative class and collective members could learn of their rights. With great deference to the district court's case management responsibilities, this Court should affirm the district court's orders and return this case to the district court where it belongs.

## STATEMENT OF JURISDICTION

Better's appeal violates two fundamental principles of appellate jurisdiction. First, appeals must generally be taken from final judgment. 28 U.S.C. § 1291. Here, Better seeks review of two

3

interlocutory orders. *See* ER-259. Second, appeals must be timely. In this case, the deadline to appeal was 30 days. *See* Fed. R. App. P. 4. "This time limit is jurisdictional." *Sierra On-Line, Inc. v. Phoenix Software, Inc.*, 739 F.2d 1415, 1418 (9th Cir. 1984). The court below issued the orders Better seeks to appeal on May 17, 2022 and July 21, 2022, but Better did not notice its appeal until August 1, 2022, rendering it untimely as to the May 17 Order. ER-259.

Better's failure to timely appeal the May 17 Order leaves this Court without jurisdiction to review that order. Better appeals from the July 21 Order in an attempt to reach back to the May 17 Order, but the July 21 Order does nothing more than affirm the holdings in the May 17 Order. Because the May 17 Order decided all the issues Better asks this Court to review, Better cannot use the July 21 Order as a bridge to cure its failure to file a timely notice of appeal.

The details of these orders confirm there is no appellate jurisdiction. In the May 17 Order, the district court: (1) invalidated releases and arbitration agreements for putative class members who were employed by Better at the time they were presented, "as to these putative class members' participation, and claims arising from facts

4

pled, in this litigation[,]" *see* ER-45–46; (2) declined to invalidate arbitration agreements signed by new hires after the rollout; ER-46; (3) ordered the parties to meet and confer regarding curative notice to be submitted for court approval, ER-46; and (4) ordered that Better "communicate with putative class members regarding the subject matter of this litigation only in writing and with Court approval." ER-47. Better did not appeal that ruling within 30 days.

The parties complied with the May 17 Order, meeting and conferring about the curative notice and jointly filing a "Notice of Disputes Regarding Court-Approved Curative Notice" ("Notice of Disputes") to address limited areas of disagreement. *See* ER-93. In the July 21 Order, which resolved the parties' disputes about the content and scope of the curative notice, the district court: (1) affirmed that its May 17 Order applied to putative class and collective members nationwide, not just California class members, ER-8; (2) affirmed that its May 17 Order applied to all putative class/collective member employees who were not new hires at the time they signed the agreements at issue, *id.*; (3) resolved the parties' disputes about language to be included in the curative notice, ER-8–10; (4) ordered that

5

Better file a notice of compliance after delivering the curative notice, ER-11; and (5) denied Better's requested curative notice language regarding communication with employees, including its request to "discuss wage and hour matters with employees . . . and obtain factual information to defend itself in this litigation[.]" ER-11. The district court denied the final request because it "would circumvent [the] Court's order requiring that *ex parte* communications regarding the subject matter of this litigation be done in writing and with prior court approval." ER-11. Better then filed its appeal.

Though Better's appeal of the July 21 Order is timely as to that Order, Better still must find a source of appellate jurisdiction for this Court to review that interlocutory ruling. Better fails in this endeavor. Citing *Fox v. Saginaw County, Michigan*, 35 F.4th 1042 (6th Cir. 2022), Better argues this Court has appellate jurisdiction because the orders collectively restrain its speech. But the July 21 Order—the only order Better timely appealed—does not impose any *new* restrictions on Better's speech. Instead, in merely affirmed the scope of the May 17

Order. ER-11.[1] Without a new prior restraint on speech, there is nothing in the July 21 Order for Better to appeal.

Better's portion of the Notice of Disputes confirms that Better believed the May 17 Order restrained its speech. *See* ER-31 (arguing that the May 17 Order "violates the Constitutional standard set forth in *Gulf Oil*"). Hoping to sidestep its failure to timely appeal the May 17 Order, Better attempts to shoehorn that order into the July 21 Order by characterizing the parties' Notice of Disputes as a motion for reconsideration. App.Br. 6. But it was not. Under applicable Local Rules, a motion for reconsideration must be based on changed facts or law, or on a "manifest showing of a failure to consider material facts." C.D.Cal. R. 7-18. Better neither cited nor addressed this standard in the

---

[1] A temporary prohibition on communication, issued under Rule 23(d), does not confer appellate jurisdiction. *See Glass v. FMM Enterprises, Inc.*, 755 F. App'x 700, 701 (9th Cir. 2019) (unpublished); *see also Radcliffe v. Transunion, LLC*, 419 F. App'x 768, 769 (9th Cir. 2011) (unpublished) (finding no appellate jurisdiction over Rule 23(d) order limiting communications with class members because it was reviewable after final judgment). If the July 21 Order is a prior restraint on speech, it could be viewed as a temporary once since it only prohibits speech without approval of the district court. ER-11. The May 17 Order could also be viewed as temporary, because it only applies "until further notice of this Court . . . ." ER-46–47.

Notice of Disputes. ER-26–34. Nor did Better's portion of the Notice of Disputes ask the district court to revise the May 17 Order. Instead, the portions of the July 21 Order addressing Better's speech arise from the parties' disagreement regarding language in the proposed curative notice. ER-31. On this point, Better did not ask the Court to *reconsider* its prior order, it simply asked the court to "adopt its proposed Corrective Notice" because it believed its proposed language aligned more appropriately with the May 17 Order. ER-26, ER-31. The record is clear: the Notice of Disputes addressed the form and content of the notice to be issued pursuant to the May 17 Order. It did not seek reconsideration of that order.

Moreover, Better addressed the timeliness of any appeal in the Notice of Disputes, arguing that it could appeal the May 17 Order "via a writ petition or after final judgment." ER-31. On this point, Better was right, in part. Better is free to appeal the May 17 Order after final judgment, which is why this Court has no jurisdiction now. Better did *not* characterize the Notice of Disputes as tolling its right to appeal at the time of filing, nor did it argue that review after final judgment

would be inadequate. Better's failure to promptly appeal the May 17 Order is fatal to this Court's jurisdiction to review that order.

Better also argues this Court has jurisdiction over both orders because the May 17 Order "had the practical effect of an injunction . . . and the July 21 Order refused Better's request to modify the injunction." App.Br. 6–7. But as this Court has recognized, "a party that has failed to appeal from an injunction cannot regain its lost opportunity simply by making a motion to modify or dissolve the injunction, having the motion denied, and appealing the denial." *Gon v. First State Ins. Co.*, 871 F.2d 863, 866 (9th Cir. 1989). "As a general rule, therefore, the denial of a motion to modify or dissolve an injunction, or to reconsider a request for an injunction, will be appealable only if the motion raises new matter not considered when the injunction was first issued." *Sierra On-Line*, 739 F.2d at 1419.[2] Since the Notice of Disputes did not raise any new matters not previously considered, the district court's July 21 refusal to modify its May 17 Order does not result in a newly appealable order.

---

[2] *See*, *e.g.*, *Hook v. Arizona Dept. of Corrections*, 107 F.3d 1397, 1401 (9th Cir. 1997) ("based on intervening state statute, the defendants seek to modify the injunctions").

Citing *Hook*,[3] Better argues its appeal is timely because the May

17 and July 21 orders "merged" together. App.Br. 6. But the

jurisdictional finding in *Hook* arose from "unique circumstances," *Hook*,

107 F.3d at 1401, and is readily distinguishable here. In *Hook*, the

defendant filed a post-judgment motion to modify an injunction and the

plaintiffs cross-moved for contempt. *See id* at 1400. The district court

consolidated the motions but withheld argument on the amount of

sanctions to avoid any "spillover effect" on the underlying issues. *Id.* at

1402. After denying the motion to modify and holding another hearing,

the district court imposed sanctions. The defendant filed a notice of

appeal less than a week after the sanctions order but more than 30 days

after the order denying the motion to modify. *Id.* at 1401.

This Court held that the appeal was timely. *Id.* at 1402. Because

both "the modification and contempt motions were brought after entry

of the final injunctions and consent decree," i.e., after final judgment,

the "'final' order resolving the entire dispute was the later contempt

order." *Id.* at 1401. This result flows from the general principle that

"[w]hen an appeal [from an interlocutory order] is not taken, the

---

[3] 107 F.3d at 1401.

10

interlocutory order merges in the final judgment and may be challenged in an appeal from that judgment." *Baldwin v. Redwood City*, 540 F.2d 1360, 1364 (9th Cir. 1976). In *Hook*, the post-judgment orders merged together because the contempt order was "the 'final' order resolving the entire dispute . . . ." *Hook*, 107 F.3d at 1401.

The "unique circumstances" of *Hook* are not present here. The July 21 Order is not a "'final order resolving the entire dispute . . . ." *Hook*, 107 F.3d at 1401. It is merely an interlocutory order that announces no new injunctions and no additional restrictions on speech. *Hook* is therefore inapplicable. The May 17 and July 21 Orders may indeed merge down the line, but only on appeal from a final judgment.

Better also references this Court's jurisprudence that an interlocutory order may be appealable if it is "inextricably bound up with the order from which appeal is taken." *United States v. Gila Valley Irrigation Dist.*, 345 F. App'x 281, 283 (9th Cir. 2009); *see* App.Br. 6 (citing *Gila Valley Irrigation Dist.*). But this doctrine presumes appellate jurisdiction over the later-filed order. *See*, *e.g.*, *Doe v. Regents of Univ. of Cal.*, 891 F.3d 1147, 1154 (9th Cir. 2018) (doctrine applies if an order is "properly before [the court]"); *Idaho Watersheds Project v.*

11

*Hahn*, 307 F.3d 815, 824 (9th Cir. 2002) ("28 U.S.C. § 1292(a)(1) confers jurisdiction not only over orders concerning injunctions, but also over matters inextricably bound up with the injunctive order from which appeal is taken."); *Self-Realization Fellowship Church v. Ananda Church of Self-Realization*, 59 F.3d 902, 906 (9th Cir. 1995) (earlier summary judgment orders were "necessary predicates" to appealable order lifting preliminary injunction); *TransWorld Airlines, Inc. v. Am. Coupon Exch., Inc.*, 913 F.2d 676, 680 (9th Cir. 1990) (this Court had appellate jurisdiction to review merits orders that were "inextricably bound up" with the appealable permanent injunction).

Here, there is no independent appellate jurisdiction over the July 21 Order because it neither announced an injunction nor imposed a new prior restraint on Better's speech. *See supra* p. 9–11. Since there is no jurisdiction over the July 21 Order, Better cannot use the "inextricably intertwined" doctrine to merge the arguably appealable aspects of the May 17 Order (i.e., a prior restraint on speech) into the July 21 Order. *See Gon*, 871 F.2d at 866 ("a party that has failed to appeal from an injunction cannot regain its lost opportunity simply by making a motion to modify or dissolve the injunction, having the motion denied, and

appealing the denial"). Without appellate jurisdiction over the July 21

Order, there is no appealable order into which the May 17 Order may

"merge."

For all of these reasons, the Court should dismiss Better's appeal

for lack of jurisdiction. If, however, this Court believes it has

jurisdiction because the July 21 Order announces a new restriction on

speech, the "inextricably intertwined" doctrine—which is applied

narrowly and rarely—does not extend that jurisdiction to the May 17

Order. As this Court noted recently:

> A court may exercise pendent jurisdiction and 'review an
> otherwise non-appealable ruling when it is 'inextricably
> intertwined' with . . . the order properly before [the court].'
> *Doe v. Regents of Univ. of Cal.*, 891 F.3d 1147, 1154 (9th Cir.
> 2018) (quoting *Meredith v. Oregon*, 321 F.3d 807, 812-13 (9th
> Cir. 2003)). This standard is met only when the issues are '(a)
> . . . so intertwined that [the Court] must decide the pendent
> issue in order to review the claims properly raised on
> interlocutory appeal, or (b) resolution of the issue properly
> raised on interlocutory appeal necessarily resolves the
> pendent issue.' *Hernandez*, 897 F.3d at 1139-40. We interpret
> this standard 'narrowly' and apply it only in 'extremely
> limited' circumstances. *Id.* at 1139 (quoting *Puente Ariz. v.
> Arpaio*, 821 F.3d 1098, 1109 (9th Cir. 2016)).

*Andrews v. City of Henderson*, 35 F.4th 710, 720 (9th Cir. 2022).

"Exercising pendent appellate jurisdiction is a rare event." *United*

*States v. Tillman*, 756 F.3d 1144, 1149 (9th Cir. 2014). For such

13

jurisdiction to exist, "[m]ore is required than that separate issues rest on common facts." *United States v. Oakland Cannabis Buyers' Coop.*, 190 F.3d 1109, 1113 (9th Cir. 1999). "Two issues are not 'inextricably intertwined' if the appellate court must apply different legal standards to each issue . . . ." *Cunningham v. Gates,* 229 F.3d 1271, 1284-–85 (9th Cir. 2000).

Here, there is no jurisdiction over the May 21 Order because the two orders are merely "'intertwined' but not 'intextricably' so." *Tillman,* 756 F.3d at 1149–50 (declining to exercise pendent appellate jurisdiction over disqualification of counsel appeal because it was not inextricably intertwined with the sanctions order over which it had jurisdiction). Better claims the district court abused its discretion in several separate and distinct ways. *See* App.Br. 26, 34, 43. But the Court need not determine whether the district court abused its discretion in invalidating employment agreements before determining whether the district court improperly restrained Better's ability to speak to its employees. These are merely "separate issues rest[ing] on common facts." *Oakland Cannabis Buyers' Coop.*, 190 F.3d at 1113.

Appellate courts frequently invoke their discretion and decline to exercise pendent appellate jurisdiction over rulings not subject to interlocutory review, including when they are "[w]ary that [a party] seeks 'to parlay [a]…collateral order[] into [a] multi-issue interlocutory appeal ticket." *Watkins v. Healy*, 986 F.3d 648, 659 (6th Cir. 2021). Better is clearly most concerned with the May 21 Order invalidating the various agreements, as opposed to the July 21 Order's alleged prior restraint on speech, since Better devotes less than four pages of its fifty-six page brief to the latter issue. The Court should decline Better's request to use one minor, alleged restraint on speech as an avenue for interlocutory review of an order from which Better failed to timely appeal. Permitting this gambit would open the floodgates to untimely appeals based on unsuccessful motions to revisit, modify, clarify, or amend prior rulings.

Lastly, the Court should decline Better's request to accept this appeal as a petition for a writ of mandamus. "The remedy of mandamus is a drastic one, to be invoked only in extraordinary situations." *Kerr v. U. S. Dist. Ct. for N. Dist. of California*, 426 U.S. 394, 402 (1976). This Court considers the following factors on a petition for a writ of

15

mandamus: "whether (1) the party seeking the writ has no other means, such as a direct appeal, of attaining the desired relief, (2) the petitioner will be damaged in a way not correctable on appeal, (3) the district court's order is clearly erroneous as a matter of law, (4) the order is an oft-repeated error, or manifests a persistent disregard of the federal rules, and (5) the order raises new and important problems, or issues of law of first impression." *Cole v. U.S. Dist. Ct. For Dist. of Idaho*, 366 F.3d 813, 817 (9th Cir. 2004).

Better presents arguments on only two of these factors, and those arguments are unavailing. First, Better claims it has no other means of obtaining direct relief. But the order below provides that means by allowing Better to seek court approval for specific communications it wishes to disburse to its employees. ER-47 (Better may "communicate with putative class members regarding the subject matter of this litigation . . . with Court approval"). Better has not done so.[4] Second,

---

[4] Better may argue that it attempted to do so in the Notice of Disputes, but it did not propose any specific communications. *See* ER-31–32. Instead, Better sought blanket permission to "discuss wage and hour matters . . . and obtain factual information to defend itself in this litigation." ER-11.

Better argues its right to relief is "clear and indisputable." But Better is wrong, as discussed in more detail below.

For these reasons the Court should dismiss this appeal for lack of jurisdiction.

## STATEMENT OF ISSUES

Better's appeal presents the following issues:

1) Whether this Court has jurisdiction over Better's appeal of the July 21 Order.

2) If the Court has jurisdiction over Better's appeal of the July 21 Order, whether the Court also has jurisdiction over Better's untimely appeal of the May 17 Order.

3) Whether district courts' case management responsibilities include the duty and authority to control pre-certification communications with putative members of a Rule 23 class.

4) Whether district courts' case management responsibilities include the duty and authority to control communications with putative members of a collective action under the FLSA.

5) Whether district courts' case management duties and authority include the power to invalidate agreements resulting from

17

improper communication, narrowly tailored to remedying the

impact of those communications on the litigation.

6) Whether this Court should disturb the district court's case

management orders for abuse of discretion.

## STATEMENT OF THE CASE

## I.    PROCEDURAL HISTORY

Plaintiff filed this putative class and collective action on

September 18, 2020 and served Better on September 28, 2020. ER-265–

66. Plaintiff alleges that Better misclassified underwriting employees as

exempt from the overtime requirements of state and federal law,

thereby failing to pay them proper wages when they worked overtime

hours on a workweek (state and federal law) or daily (state law) basis.

ER-235–45. Plaintiff also alleges that Better violated other provisions of

the California Labor Code relating to breaks, wage statements, final

pay, and expense reimbursement. ER-245–54.

Better's immediate response to the suit was to roll out (1) an

employment agreement containing an arbitration provision with a

class/collective action waiver ("Employment Agreement"); (2) a

retention bonus agreement offering $10,000 to employees who remain

18

employed for six months ("Retention Agreement"); and (3) a release agreement with a 5 day response deadline, offering $5,000 in exchange for a release of state law claims raised in this case ("Release Agreement"). ER-111–14. After an unsuccessful early mediation, Plaintiff filed a motion asking the district court to invalidate the arbitration provision and Release Agreement as to claims in this case and to order Better to distribute corrective notice to affected employees. *See* ER-162.

On May 17, 2022, the district court issued an order granting Plaintiff's motion in part. ER-35. In that order, the court: (1) invalidated releases and arbitration agreements for putative class members who were employed by Better at the time they were presented, "as to these putative class members' participation, and claims arising from facts pled, in this litigation[,]" *see* ER-45–46; (2) refused to invalidate arbitration agreements signed by new hires after the rollout, ER-45; (3) ordered the parties to meet and confer regarding curative notice to be submitted for court approval, ER-46; and (4) ordered that Better "communicate with putative class members

19

regarding the subject matter of this litigation only in writing and with Court approval." ER-47.

As instructed by the Court, the parties conferred about the contents of the curative notice. After failing reach agreement, the parties filed a Notice of Disputes on May 31, 2022. ER-13. In response, the district court issued an order on July 21, 2022 which affirmed the holdings in its May 17 Order and resolved the parties' disputes regarding curative notice. ER-8–11.

Better filed a notice of appeal on August 1, 2022. ER-263.

## II. FACTUAL BACKGROUND

### A. Better's Blitz in Response to Suit



████████████████████████████████████████
████████████████████████████████████████

██████████

After being served with this suit in late September 2020, Better pivoted. At that time, no underwriters had arbitration agreements. SER-41 ("we don't have ANY arbitration language to offers right?" (reply: "nope")). Knowing that ████████████████████████████████ ██████████ having confirmed that it did not have arbitration agreements with its underwriters, and wanting their releases, Better called its HR management to "an important mtg w/ legal re: FLSA Arbitration/Settlement Strategy." SER-38.

████████████████████████████████████████
████████████████████████████████████████
████████████████████████████████████████
████████████████████ ███████████████████
████████████████████████████████████████
███████████████████████ ████████████████
█████████████████████████████████
████████████████████████████████████████████
██████████

21

To implement this plan, Better invited all underwriters to an "Underwriting Huddle" set for 4:00 PM on October 19, 2020 over Zoom. SER-57–58. This meeting was mandatory and during work hours. ER-197. Better's Director of Underwriting and HR led this Zoom meeting, which included all currently-employed underwriters (i.e., all currently employed putative class and collective action members). ER-103, ER-197. Better told them that a former employee had filed a lawsuit for overtime. ER-113. But Better was careful not to disclose the name of the employee or his counsel, or the court or a case number, or that the case was filed as a class and collective action which they had a present right to join. *Id.* Better told the underwriters that the Employment Agreement was mandatory. ER-111. There was no mention of arbitration at the meeting. *See* ER-106–115.

Better's presentation left underwriters confused. ER-197. An Underwriting Manager gave upper management the following feedback:

> As for the latter part [Release of claims], I know this is where most were lost. I am sure the amount of information you all can divulge is limited so it really left most confused on what to do….My thoughts are the meeting content should have been separated in a way, a high for the RETENTION and then onto the required agreements that needed to be signed. The OT one should have been totally a silo meeting for sure.

SER-102. They weren't the only ones confused –Defendant's Head of People was asking in November, 2020 "is the arbitration the release agreement?" SER-109. Even underwriters who claimed to understand the lawsuit were confused. For example, one employee wrote:

> I read the case filing document and can confirm **I have always known I am an exempt employee (salaried only/not eligible for overtime) . . . .** The company and my managers have always looked out for my overall happiness/welfare and I've witnessed the same for my fellow employees.

ER-157 (emphasis added). Better cites another employee who wrote that the company had been "fair in the overall compensation." ER-122. But this case is not about *whether* Better classified its underwriters as exempt, it is not about management's concern for employee happiness, and it is not about whether Better's overall compensation was fair. This case addresses whether Better's overtime classification was legal under state and federal overtime law. *See* ER-235.

Better targeted putative class and collective members with this roll-out. *See* SER-57–58 (Zoom meeting only involved underwriting employees); ER-135 (Employment Agreements provided to underwriters in fall 2020). It was not until months after the roll-out, in January 2021, that Better implemented its arbitration program to all employees via

23

the Employment Agreement. ER-135–36. This despite Better telling its underwriters—incorrectly—that the Employment Agreement would be distributed to "All US Employees" on "10/19/2020." ER-114.

## B. The Employment Agreement: Forced Arbitration and Class/Collective Waivers[5]

Better's Employment Agreement, which included the arbitration provision, explicitly stated: "As a condition of my employment with [Better] I agree to the following provisions[.]" ER-141. The Agreement's At-Will section notified underwriters that their "employment relationship may be terminated at any time, with or without good cause or for any or no cause." *Id.* The Agreement did not assure employees there would be no adverse consequences if an employee chose not to sign. *See* ER-141–46. And it required arbitration "only in my individual capacity, and not as a plaintiff, representative, or class member in any purported class, collective, or representative lawsuit" with the pertinent exception only of "bringing a [PAGA] representative lawsuit or

---

[5] Though not a basis for invalidating previously signed arbitration agreements, imposing a forced arbitration agreement on California employees was made illegal by AB51. *See Chamber of Com. of United States v. Bonta*, 13 F.4th 766 (9th Cir. 2021), reh'g granted, opinion withdrawn, 45 F.4th 1113 (9th Cir. 2022).

24

proceeding" or "claims that cannot be arbitrated under…law that expressly prohibits arbitration of a claim notwithstanding the application of the FAA." ER-154. The Agreement was required "in consideration of my employment[.]" *Id.*

Nowhere in its 15 pages did the Employment Agreement or its arbitration provision disclose the existence of this case, the name of this lawsuit or its claims and counsel,[6] or that signing the Agreement could impact underwriters' then-available right to participate in this lawsuit as an opt-in plaintiff or as a member of a putative opt-out California class. ER-141–55. The arbitration provision had no carve out for pending litigation, and it did not contain an opt-out provision. ER-154–55.

### C. The Release Agreement

Better sent the above-described Employment Agreement to underwriters at 5:05 PM ET on October 20. SER-35. The DocuSign email to e-sign the agreement stated in the subject line, and twice in

---

[6] Although the Employment Agreement stated "I agree that I have been provided an opportunity to seek the advice of an attorney of my choice before signing this Agreement," it neither identified Plaintiff's counsel nor disclosed that counsel seeks to represent them in this case on contingency. ER-141–55.

the body of the email (including once in larger font): "Please DocuSign" and in bold font warned: "**Do Not Share This Email**." ER-200.

At 5:42 PT ET,[7] by a separate DocuSign email, Better presented underwriters with a Release Agreement that they "must…sign and return . . . within five (5) days of its receipt" to receive the lump sum $5,000 offered to all, regardless of their potential damages. ER-226. That DocuSign email contained the same admonition that employees should **"Not Share This Email.**" ER-200. At the time Better distributed the Release Agreement, 94 underwriters had already reviewed the Employment Agreement and 76 had already signed it. SER-35.

The text of the Release Agreement, unlike the Employment Agreement, identified this lawsuit and disclosed a summary of its pending claims filed on underwriters' behalf. ER-226–27. This description provided nothing from which non-lawyer employees could determine the issues in dispute regarding Better's exempt classification, the potential value of the claims being released, or even determine what hours triggered overtime pay. *Id.* Better chose not to provide or attach a

_____

[7] SER-35.

26

copy of the Complaint with the Release Agreement although it could

easily have done so. Instead, after its new Employment Agreement

reminded underwriters that Better may, without notice, review their

company and personal media devices to review website browsing

history,[8] the Release Agreement listed a URL link to Plaintiff's

counsel's case website.[9] ER-227. Thus, employees utilizing their

employer-searchable computer systems would create a digital trail of

interest (indicating potential "disloyalty") if they clicked it.

    The purportedly-released claims broadly included "any and all

claims (except those under the FLSA) that were or could have been

---

[8] The Employment Agreement waived any expectation of privacy in both Company and personal computer/media devices and systems, stating Defendant "without further notice" may "at its sole discretion . . . have reasonable access . . . to such personal [] Systems to review [or] retrieve . . . Company information," may "audit and search all [of its company media] items and systems including "access[ and] review . . . [of] all website visits," and may "monitor usage of the Internet, including websites visited and any information I have downloaded." ER-143, ER-145.

[9] That URL initially pointed to a .pdf of the Complaint. However, Nichols Kaster, Plaintiff's counsel, changed its case website for this litigation on October 23, 2020. On and after that date, the URL link listed in the Release Agreement no longer directed to a .pdf of the Complaint, instead landing on a general case summary page regarding eligibility, additional information, and case updates – which did not contain a .pdf of the Complaint or recite its contents until much later in the litigation.

asserted in the Lawsuit," including "claims under the . . . California Private Attorneys' General Act." ER-227. The Release Agreement did not mention arbitration. ER-226–30.

### D. The Recap Email

After sending out the agreements on October 19, 2020, Alex D'Amico (V.P. of People) drafted a "recap" of what had been communicated to underwriters and circulated it at 11:07 PM on October 19th. SER-49. That draft did not contain the word "arbitration" and made no mention that signing the arbitration agreement would bar participation in this case. *Id.* Other management proposed edits[10] but none suggested flagging that signing it would bar participation in this pending class/collective action. *Id.*

*After* management circulated all of those suggested edits, the "recap" was later changed (author undisclosed) to add mention of "arbitration" and to "flag" its effect on participation. SER-52. This email, which was sent on October 20, was the first time Better alerted

---

[10] *See, e.g.*, SER-49 ("maybe swap 'Highlights' for 'Recap' since none of this is particularly positive haha", and suggesting the recap should confirm that the Employment Agreement must be signed prior to the monetary payout on any signed Retention or Release Agreement).

underwriters that the Employment Agreement contained an arbitration provision, mentioned that the arbitration provision would bar participation in a pending lawsuit,[11] or informed underwriters that the release payment was conditioned on signing the arbitration agreement. But by the time underwriters were sent the October 20th "recap" email, more than 140 had already viewed the Employment Agreement sent October 19th, and more than 110 had already signed it. SER-35–36.

### E. The Signature Blitz

After Better distributed the Agreements, the pressure was on to obtain quick signatures. SER-55 ("the legals said on Friday they wanted this turned around in a day. . . . In the first night we got a great rate of return: 1. 72 Release Returned: 37% response rate. 2. 96 Retention Signed: 45% of eligible employees. 3. 98 Employment Agreement: 46% of population"). Better tracked how many underwriters signed the arbitration agreement, and celebrated how many people signed so quickly. SER-95. Better's human resources staff praised the fact that 98 arbitration agreements had been signed by 10:42 pm on October 19,

---

[11] And even then, the recap did not mention the class/collective action waiver. *See* SER-52.

2020 as "Great numbers!" adding "Hopefully with the [recap] email going out this AM we'll have even more responses." *Id*. Lest there be any doubt that Better's focus was on maximizing the pressure for underwriters to sign, Better's Deputy Counsel demanded that underwriters self-report a decision not to sign either "voluntary" agreement. SER-107.

Anyone who hadn't signed the arbitration agreement by October 21, 2020 received one-on-one follow-up communication from their managers. SER-78 ("Below is a list of 15 names that I think we should FU with today if possible. They either signed the Retention Agreement, Release agreement, or both, but have NOT signed the Employee Agreement yet."). Kenna Meyerhoff instructed management to "thank them for signing the [other] agreements [but] let them know they will need to sign the employment agreement regardless." *Id*. Management instructed Underwriting Managers to "chase" underwriters identified (by name) as having failed to sign the arbitration agreement by November 1, 2020. SER-90. Management had "one on one conversations to address any questions [underwriters] had" about the agreements.

30

SER-104. Better actively pursued and tracked signatures. SER-81, 84–100.

The next day (October 22), Better sent an email ordering any underwriters who decide not to sign the "voluntary" Release Agreement to self-report their refusal by email to Defendant's HR management:[12] "Just a friendly reminder that we're looking to have folks complete the following by tomorrow, Oct. 23rd. 1. Sign the release and retention agreements OR 2. Let us know that they don't plan to sign them by responding to this [Meyerhoff] email." SER-97. If an underwriter self-reported their decision not to sign a release, their notification was forwarded to Defendant's HR management and legal department personnel – and often their Underwriting Manager as well. SER-81–84.

## SUMMARY OF ARGUMENT

For the reasons discussed above, the Court should dismiss this appeal for lack of jurisdiction. If the Court decides it has jurisdiction, however, it should affirm the district court's case management orders.

---

[12] Better boasts that "of the few employees who chose not to sign a Release, at least two emailed Better's human resources department to affirm that choice," App.Br. 13, as if they did so on their own volition.

District courts have broad discretionary authority over the litigation on their dockets. That includes the duty and authority to control communications in class actions, as proscribed by Rule 23(d) of the Federal Rules of Civil Procedure. The Supreme Court has recognized that this duty and authority applies equally to collective actions under the FLSA, since similar case management concerns arise in both class and collective actions.

District courts' duty and authority over class actions includes the authority to review communications regarding settlement and assess the fairness of settlement agreements themselves, as outlined in Rule 23. Similarly, because the FLSA grants unwaivable statutory rights, district courts have the duty and authority to review FLSA settlements for fairness. These duties, coupled with district courts' right to invalidate various agreements between parties relating to the course and conduct of litigation, also support a district court's right to invalidate post-suit arbitration agreements obtained through misleading and coercive communications.

Bearing in mind the public policy behind Rule 23 and the FLSA, this Court should affirm that the district court acted within its

32

discretionary authority in invalidating settlement agreements and certain arbitration agreements as they relate to the claims in this case. The district court, which is in the best position to monitor and shape the parties' litigation conduct, properly determined that Better's post-suit signature blitz, targeted at underwriters and with the express purpose of reducing or eliminating its exposure, warranted this relief. Likewise, the district court was within its authority in limiting Better's communications regarding the subject matter of this case. Even if the Court believes that this restriction on speech was overbroad, the remedy is to reverse the district court as to that one aspect of its orders while leaving the remainder of its case management orders undisturbed.

## ARGUMENT

### I. STANDARD OF REVIEW

Should the Court decide it has jurisdiction, it must review the district court's case management orders under an abuse of discretion standard. *Fox*, 35 F.4th at 1047. District court case management orders are "entitled to considerable weight on appeal since [the district court] is in the best position to assess the circumstances." *Van Bronkhorst v.*

33

*Safeco Corp.*, 529 F.2d 943, 947 (9th Cir. 1976). District court orders under Rule 23, including orders restricting communications and orders regarding settlements, are reviewed for abuse of discretion. *Gulf Oil Co. v. Bernard*, 452 U.S. 89, 103 (1981) (regarding orders under Rule 23(d)); *In re Bluetooth Headset Prod. Liab. Litig.*, 654 F.3d 935, 940 (9th Cir. 2011) (regarding settlement approval); *see also Torres v. Gristede's Operating Corp.*, 519 F. App'x 1, 4 (2d Cir. 2013) (regarding approval of FLSA settlements).

## II.   THE DISTRICT COURT HAS BROAD DISCRETION AND AUTHORITY TO CONTROL COMMUNICATIONS AND INVALDIATE RESULTING AGREEMENTS

"Courts invested with the judicial power of the United States have certain inherent authority to protect their proceedings and judgments in the course of discharging their traditional responsibilities." *Degen v. United States*, 517 U.S. 820, 823 (1996). Accordingly, the Rules of Civil Procedure grant district court judges broad discretion to "regulate practice in any manner consistent with federal law, rules adopted under 28 U.S.C. §§ 2072 and 2075, and the district's local rules." Fed. R. Civ. P. 83(b); *see also Van Bronkhorst*, 529 F.2d at 947, 951 (observing

"[t]here is no question that a District Court has the power to dismiss a claim of a plaintiff with prejudice for failure to comply with an order of the court" based on "[t]he broad and inherent power of the District Court to regulate litigation before it").

The Federal Rules of Civil Procedure vest district courts with additional case management responsibilities in class actions like this one. *See, generally*, Fed. R. Civ. P. 23 (outlining requirements for class certification, notice to the class, judgments, approving settlements or dismissals, addressing objections from class members, appointing class counsel, and awarding attorneys' fees). The Rules specifically, and broadly, authorize the district court to issue orders that "determine the course of proceedings," "impose conditions on the represented parties or on intervenors," or "deal with similar procedural matters." Fed. R. Civ. P. 23(d). A district court may require notice to the class "to protect class members and fairly conduct the action[.]" Fed. R. Civ. P. 23(d)(1)(B). Rule 23 also "vests a district court with the authority and discretion to protect the interests and rights of class members and to ensure its control over the integrity of the settlement approval process." *Hanlon v. Chrysler Corp.*, 150 F.3d 1011, 1025 (9th Cir. 1998). "[T]he due process

35

rights of absent class members are important and . . . district judges who preside over class actions must ensure that those interests are fairly protected." *Radcliffe v. Hernandez*, 818 F.3d 537, 546 (9th Cir. 2016).

While the FLSA does not follow Rule 23 procedures, the Supreme Court has recognized that a district court's responsibility for managing communications is no less important under the FLSA's opt-in collective action mechanism. *See Hoffmann-La Roche Inc. v. Sperling*, 493 U.S. 165 (1989). Indeed, "[o]ne of the most significant insights that skilled trial judges have gained in recent years is the wisdom and necessity for early judicial intervention in the management of litigation." *Id.* at 171. Individual FLSA settlements are subject to court approval, and courts may invalidate settlement agreements that do not satisfy the public policy underlying the FLSA. *See*, *e.g.*, *Lynn's Food Stores, Inc. v. United States*, 679 F.2d 1350 (11th Cir. 1982) (requiring district court or Department of Labor approval of FLSA settlements).

As discussed below, the district court properly exercised its case management authority in issuing the orders Better challenges on appeal.

36

### A. District Courts Have the Duty and Authority Under Rule 23(d) to Control Pre-Certification Communications with Putative Class Members.

"Because of the potential for abuse, a district court has both the duty and the broad authority to exercise control over a class action and to enter appropriate orders governing the conduct of counsel and parties." *Gulf Oil Co. v. Bernard*, 452 U.S. 89, 100 (1981). This duty and authority flows from Rule 23(d)(1), which permits district courts to "issue orders that . . . (C) impose conditions on the representative parties or on intervenors;" or "(E) deal with similar procedural matters." Fed. R. Civ. P. 23(d)(1). "Obviously district courts must have broad discretion, resting on the specific facts of each case, in framing procedures for class actions under Fed. R. Civ. P. 23." *In re Victor Techs. Sec. Litig.*, 792 F.2d 862, 864 (9th Cir. 1986).

The district court's duties and authority under Rule 23(d) extend to uncertified putative classes. "This is because 'unlimited contacts by defendants with class members or potential class members may serve to undermine the purposes of Rule 23, by allowing defendants to reduce their liability by encouraging potential class members not to join the

litigation.'" *Friedman v. Intervet Inc.*, 730 F. Supp. 2d 758, 765 (N.D. Ohio 2010) (quoting *Burrell v. Crown Cent. Petroleum, Inc.*, 176 F.R.D. 243 (E.D. Tex. 1997) and collecting cases). This case exemplifies the need for pre-certification district court involvement, as Better's agreement blitz, if allowed to stand, will undermine the purpose of Rule 23 by severely limiting Better's exposure before defense counsel even made an appearance in the case.

> **B. District Courts Have the Duty and Authority, as Recognized in *Hoffman La-Roche*, to Control Pre-Certification Communications with Putative Members of a Collective Action.**

In *Hoffmann-La Roche*, the United States Supreme Court applied *Gulf Oil* to collective actions under the FLSA's opt-in procedure. *Hoffmann-La Roche*, 493 U.S. at 171. Citing *Gulf Oil*, the Supreme Court recognized that "a trial court has a substantial interest in communications that are mailed for single actions involving multiple parties." *Id.* Although FLSA collective actions[13] do not follow Rule 23,

---

[13] *Hoffman-La Roche* was an Age Discrimination in Employment Act ("ADEA") case, but the ADEA follows the FLSA's collective action procedure. *Hoffmann-La Roche*, 493 U.S. at 167.

the Court found that the "same justifications" for the district court's authority to restrict communications "apply in the context of an ADEA action" utilizing the FLSA's opt-in mechanism. *Id.* Moreover, "[b]ecause trial court involvement in the notice process is inevitable in cases with numerous plaintiffs where written consent is required by statute, it lies within the discretion of a district court to begin its involvement early . . . ." *Id.*

The Supreme Court also looked to Rule 83 as "further support for the trial court's authority" to control communications in a collective action. *Hoffmann-La Roche*, 493 U.S. at 172. Indeed, "[o]ne of the most significant insights that skilled trial judges have gained in recent years is the wisdom and necessity for early judicial intervention in the management of litigation." *Id.* at 171. "The interest of courts in managing collective actions in an orderly fashion is reinforced by Rule 16(b) . . . ." *Id.* Thus, a district court's authority to control communications in collective actions is well-grounded in Supreme Court precedent and the Federal Rules of Civil Procedure.

The FLSA's public policy also supports the district court's role in managing communications with potential FLSA plaintiffs:

> Congress has stated its policy that [FLSA] plaintiffs should have the opportunity to proceed collectively. A collective action allows . . . plaintiffs the advantage of lower individual costs to vindicate rights by the pooling of resources. The judicial system benefits by efficient resolution in one proceeding of common issues of law and fact arising from the same alleged discriminatory activity.

*Hoffmann-La Roche*, 493 U.S. at 170. "These benefits, however, depend on employees receiving accurate and timely notice concerning the pendency of the collective action, so that they can make informed decisions about whether to participate." *Id.* Accordingly, district courts in this circuit and throughout the country follow a two-step process in which FLSA plaintiffs file a motion for "conditional certification" early in the case, based on minimal evidence. *See Campbell v. City of Los Angeles*, 903 F.3d 1090, 1109–10 (9th Cir. 2018). A successful motion results in judicially-approved notice to employees of their right to join the case. *Id.* at 109. Defendants may file a second-stage motion to "decertify" the collective action after the close of discovery. *Id.*

"Because formal notice to putative FLSA collective members is provided *after* conditional certification has been approved by the district

40

court, pre-certification, *ex parte* communication with putative FLSA collective members about the case has an inherent risk of prejudice and opportunities for impropriety." *Billingsley v. Citi Trends, Inc.*, 560 F. App'x 914, 921 (11th Cir. 2014). "To avoid such prejudice and impropriety and to ensure the potential plaintiffs have a fair opportunity to opt-in to a FLSA collective action, the district court has the discretion to 'facilitat[e] notice to potential plaintiffs' and 'broad authority' to exercise control over the collective action and to govern the conduct of counsel and parties in the collective action." *Billingsley*, 560 F. App'x at 921 (citing *Gulf Oil*, 452 U.S. at 100; *Hoffmann-La Roche*, 493 U.S. at 169–71). The district court's oversight of a collective action "includes the authority to prevent confusion and unfairness" and "the responsibility to insure that all parties act fairly while the court decides whether and how the action will move forward under the FLSA." *Id.* As such, a district court has the inherent authority to "allow putative collective action members to join the lawsuit notwithstanding their coerced signing of the arbitration agreements." *Billingsley*, 560 F. App'x at 922 (collecting cases).

41

In sum, the district court's authority to regulate Better's communications with putative members of the FLSA collective flows not from Rule 23(d), as Better argues, but from the public policy underlying the FLSA and the Supreme Court's admonition that district courts are to ensure the orderly and fair administration of collective actions. In affirming the orders below, this Court should confirm that district courts may control FLSA litigation just as the district court did here.

## C. District Courts' Duty and Authority to Control Communications Includes the Right to Invalidate Settlement Agreements.

### i. Rule 23 grants district courts the power to invalidate settlement agreements.

District courts enjoy substantial control over litigating parties' ability to enter into binding contracts. For example, parties cannot agree to the confidential treatment of litigation documents without a protective order issued by a district court. *See, e.g., Pub. Citizen v. Liggett Grp., Inc.*, 858 F.2d 775, 789 (1st Cir. 1988) (recognizing that parties must show "good cause" for a protective order issued under Rule 26(c)); *Phillips ex rel. Ests. of Byrd v. Gen. Motors Corp.*, 307 F.3d 1206,

1212 (9th Cir. 2002) (public has a common law right of access to documents filed in federal court). Similarly, parties cannot agree to extend court-ordered deadlines without district court approval. Fed. R. Civ. P. 16(b)(4). Some district courts limit the number of summary judgment motions a party may file without court approval. *See*, *e.g.*, https://www.cand.uscourts.gov/wp-content/uploads/judges/orrick-who/WHO_Standing_Order_Civil_08-25-2021.pdf. Rule 4 of the Federal Rules of Appellate Procedure limits the extensions a party can seek from the deadline to appeal. Fed. R. App. P. 4(a)(5). In all of these circumstances, a district court may (and sometimes must) invalidate a non-conforming contract.

District courts' ability to invalidate contracts extends to non-litigating parties under Rule 23. Indeed, "the due process rights of absent class members are important and . . . the district judges who preside over class actions must ensure that those interests are fairly protected." *Radcliffe*, 818 F.3d at 546. To that end, "district courts should have discretion to deal with the unique complexities and ethical concerns involved in class action lawsuits." *Id.*

43

Rule 23 vests district courts with the duty to ensure that settlement agreements affecting absent class members are fair, reasonable, and adequate. Fed. R. Civ. P. 23(e). In reviewing a class settlement, district courts must balance the following factors: "(1) the strength of the plaintiffs' case; (2) the risk, expense, complexity, and likely duration of further litigation; (3) the risk of maintaining class action status throughout the trial; (4) the amount offered in settlement; (5) the extent of discovery completed and the stage of the proceedings; (6) the experience and views of counsel; (7) the presence of a governmental participant; and (8) the reaction of the class members to the proposed settlement." *Churchill Vill., L.L.C. v. Gen. Elec.*, 361 F.3d 566, 575 (9th Cir. 2004).

District courts deny settlement approval if the parties' approval briefing fails to analyze the claims at issue or disclose the potential value of the case. *See*, *e.g.*, *Haralson v. U.S. Aviation Servs. Corp.*, 383 F. Supp. 3d 959, 970 (N.D. Cal. 2019) (noting that the maximum value of claims is "perhaps the most important factor to consider" in reviewing a settlement, and denying preliminary approval in part because plaintiffs failed to explain how they calculated the maximum value);

*Hunt v. VEP Healthcare, Inc.*, No. 16-CV-04790-VC, 2017 WL 3608297, at *1 (N.D. Cal. Aug. 22, 2017) (denying settlement approval for failure to provide "a careful analysis of the claims and the strength or weakness of any potential defenses").

District courts must also review class settlement notices to ensure they adequately inform "absent class members [of their] opportunity to opt-out and individually pursue any . . . remedies that might provide a better opportunity for recovery." *Churchill Vill.*, 361 F.3d at 575. Because settlement approval briefing is publicly filed, class members may view the full terms of the settlement and the parties' justification of its fairness when deciding whether to participate. *See, e.g., Rodriguez v. W. Publ'g Corp.*, 563 F.3d 948, 962 (9th Cir. 2009) (noting that settlement related documents were available at the clerk's office and on the settlement website). District courts deny settlement approval when notice is inadequate. *See, e.g., Valdez v. Neil Jones Food Co.*, No. 1:13-CV-00519-SAB, 2016 WL 4247911, at *2 (E.D. Cal. Aug. 10, 2016) (noting denial of preliminary approval because "the notice provisions were inadequate to comply with due process and inform the unnamed class members of the rights that are being extinguished due to the

settlement"); *In re Yahoo! Inc. Customer Data Sec. Breach Litig.*, No. 16-MD-02752-LHK, 2019 WL 387322, at *5 (N.D. Cal. Jan. 30, 2019) (settlement notice failed to adequately describe scope of release).

District courts' duties and authority, granted by Rule 23, include the authority to invalidate pre-certification settlement agreements. "[C]ourts may limit communications that improperly encourage potential class members to not join the suit, especially if the defendant fails to provide adequate information about the pending class action." *McKee v. Audible, Inc.*, 2018 WL 2422582, at *4 (C.D. Cal. Apr. 6, 2018). "Obtaining opt-out forms *ex parte* at this stage of the litigation—before a class has been certified by the Court—unquestionably frustrates the purposes of Rule 23." *Guifu Li v. A Perfect Day Franchise, Inc.*, 270 F.R.D. 509, 518 (N.D. Cal. Sept. 29, 2010).

The same principles supporting a district court's review of class settlements for fairness and adequate disclosure apply to an ex parte pre-certification settlement blitz. Where a defendant skirts district court oversight of a putative class action, a district court may invalidate settlement agreements when employees do not receive adequate notice regarding pending litigation—including the claims at issue and the

possible range of recovery. *See*, *e.g.*, *Johnson v. Serenity Transportation, Inc.*, No. 15-CV-02004-JSC, 2017 WL 4236798, at *7 (N.D. Cal. Sept. 25, 2017) (defendant's "misstatements and omissions require invalidating the Release as to all drivers and sending curative notice to all drivers notifying them that their releases are invalid"); *Slavkov v. Fast Water Heater Partners I, LP*, No. 14-CV-04324-JST, 2015 WL 6674575, at *7 (N.D. Cal. Nov. 2, 2015) (invalidating releases based on misleading communication); *Guifu Li*, 270 F.R.D. at 518 (invalidating pre-certification opt-out forms).

Better cites several cases for the proposition that district courts lack the authority to invalidate settlement agreements, but all are inapposite. For example, *Cobell v. Kempthorne* involved communications to putative class members that were completely unrelated to the subject matter of the litigation. 455 F.3d 317, 321 (D.C. Cir. 2006). It did not involve settlement agreements like those at issue here. *See id.* Moreover, an earlier decision from the *Cobell* case recognized "[t]here is no apparent support in the available case law that permits an opposing party to engage in communications with class members that have the effect of extinguishing the rights of those class

members." *Cobell v. Norton*, 212 F.R.D. 14, 18 (D.D.C. 2002). The court therefore prohibited the defendant "from contacts with any class members during the pendency of this litigation that discuss this litigation, or the claims that have arisen therein, without the prior authorization of this Court." *Id.* at 20.

In *Coffin v. Bowater Inc.*, the plaintiffs asked the court to reverse a previous ruling under the guise of a Rule 23(d) order. 224 F.R.D. 524, 526 (D. Me. 2004). The Court held that Rule 23(d) "is not intended to be used to revisit decisions the Court has made on the merits of substantive questions at issue in the case . . . ." *Id.* Plaintiffs' continued pursuit of the issue, despite an adverse ruling, "overly burdened the parties and the Court . . . ." *Id.* Here, Plaintiff did not attempt to use Rule 23(d) as an end-around a previous district court order. In the last case cited by Better, the Second Circuit merely held that Rule 23(d) does not empower district courts to enjoin parallel state court litigation. *See In re Baldwin-United Corp. (Single Premium Deferred Annuities Ins. Litig.)*, 770 F.2d 328, 335 (2d Cir. 1985). That is not the situation here.

48

Better may argue that *Fox* undermines the district court's authority to invalidate individual settlement agreements prior to certification. *See Fox*, 35 F.4th at 1048 (invalidating post-certification representation agreements with third party claims service, but not pre-certification agreements). But there is a critical distinction between this case and *Fox*. In *Fox*, the challenged communications emanated from a non-party seeking to represent putative class members making refund claims of the type that were at issue in the suit. *Fox*, 35 F.4th at 1045. In other words, the non-party purportedly acted in putative class members' interests. Here, the improper communications emanated from Better, the *opposing* party in the litigation, and were an explicit attempt to eliminate as much liability as possible and force any remaining litigation into its preferred forum. While there are reasons to allow broad pre-certification communications from entities seeking to represent putative class members' interests, those reasons do not extend to an opposing party seeking to undermine class members' rights.

### ii. The FLSA grants district courts the power to invalidate settlement agreements.

District courts' authority to invalidate settlement agreements extends to non-class FLSA claims. The Supreme Court has repeatedly emphasized the "nonwaivable nature of an individual employee's right to a minimum wage and to overtime pay under the [FLSA]." *Barrentine v. Arkansas-Best Freight Sys., Inc.*, 450 U.S. 728, 740 (1981). Accordingly, "FLSA rights cannot be abridged by contract or otherwise waived because this would nullify the purposes of the statute and thwart the legislative policies it was designed to effectuate." *Id.* (citation omitted); *see also Lynn's Food Stores*, 679 F.2d at 1352 ("Recognizing that there are often great inequalities in bargaining power between employers and employees, Congress made the FLSA's provisions mandatory; thus, the provisions are not subject to negotiation or bargaining between employers and employees.")

Because FLSA rights are unwaivable, and in recognition of the unequal bargaining power between employers and employees, "FLSA claims may not be settled without approval of either the Secretary of Labor or a district court." *Seminiano v. Xyris Enter., Inc.*, 602 F. App'x

50

682, 683 (9th Cir. 2015) (unpublished). "To approve an 'agreement' between an employer and employees outside of the adversarial context of a lawsuit brought by the employees would be in clear derogation of the letter and spirit of the FLSA." *Lynn's Food Stores*, 679 F.2d at 1354. Accordingly, district courts in this circuit regularly deny approval of FLSA settlements that fail to adequately compensate employees or otherwise conflict with the public policy underlying the FLSA. *See*, *e.g.*, *K.H. v. Sec'y of Dep't of Homeland Sec.*, No. 15-CV-02740-JST, 2018 WL 3585142, at *5 (N.D. Cal. July 26, 2018) (denying approval of FLSA settlement due to parties' failure to "provide an estimate of the Plaintiffs' range of recovery if they were to prevail on their FLSA claims"); *Dunn v. Tchrs. Ins. & Annuity Ass'n of Am.*, No. 13-CV-05456-HSG, 2016 WL 153266, at *5 (N.D. Cal. Jan. 13, 2016) (denying approval of FLSA settlement due to overbroad release of claims); *Smith v. Kaiser Found. Hosps.*, No. 18CV780-KSC, 2020 WL 5064282, at *11 (S.D. Cal. Aug. 26, 2020) (noting previous denial of class and collective

settlement because it purported to release FLSA claims without assigning them any value on top of state law class claims).[14]

### D. District Courts' Duty and Authority to Control Communications Includes the Right to Invalidate Post-Suit Arbitration Agreements.

Better's central contention on appeal is that the district court expressed hostility towards its arbitration agreements by treating them differently than other contracts. Better argues that this hostility tainted all of the district court's conclusions and, as a result, the orders must be reversed in their entirety. Better is wrong. The district court did not treat Better's arbitration program differently than any other contract affecting litigation before it, and it acted within its discretionary authority in invalidating some of the agreements.

As outlined above, district courts enjoy broad authority to invalidate contracts affecting the scope, conduct, and resolution of litigation. That authority extends to a post-filing arbitration program that undermines putative class and collective members' participation in

---

[14] Better's Release Agreement does not purport to waive FLSA claims. Nevertheless, the district court's power to invalidate improper FLSA releases supports its power to do the same for non-FLSA claims.

litigation. *See, e.g.*, *Balasanyan v. Nordstrom, Inc.*, No. 10-CV-2671-JM-WMC, 2012 WL 760566, at *4 (S.D. Cal. Mar. 8, 2012) (imposition of a class action waiver while litigation was ongoing was an improper class communication); *Williams v. Securitas Sec. Servs. USA, Inc.*, No. CIV.A. 10-7181, 2011 WL 2713741, at *2 (E.D. Pa. July 13, 2011) (ruling that agreement containing class waiver "is designed to thwart employees of [defendant] from participating in this lawsuit."); *In re Currency Conversion Fee Antitrust Litig.*, 224 F.R.D. 555, 569-70 (S.D.N.Y. 2004) (holding defendants acted improperly by obtaining arbitration agreements from class members without the court's knowledge); *McKee*, 2018 WL 2422582, at *8 (post-suit changes to arbitration agreement "were coercive and misleading attempts to interfere with putative class members' ability to participate in the" case).

In these cases, the invalidation of arbitration agreements does not reflect a hostility towards arbitration, but rather affirms the district court's right and obligation to control the litigation before it. Indeed, "the district court's power [to manage a class action] also extends to other communications that would affect participation in the lawsuit, such as the arbitration agreement at issue here." *Balasanyan*, 2012 WL

53

760566, at *3. "Courts have . . . exercised their discretionary power under Fed. R. Civ. Proc. 23(d) to invalidate or refuse to enforce arbitration agreements implemented while a putative class action is pending if the agreement might interfere with members' rights." *McKee*, 2018 WL 2422582 at *5 (collecting cases). Like any other contract affecting litigation, a district court may invalidate an arbitration agreement if circumstances warrant—and as outlined below, the district court was well within its discretionary authority to invalidate arbitration agreements here based on Better's early-suit conduct.

### III. THE DISTRICT COURT DID NOT ABUSE ITS DISCRETION BY INVALIDATING AGREEMENTS RESULTING FROM BETTER'S BLITZ

#### A. The Public Policies Behind Rule 23 and the FLSA Support the District Court's Orders.

Any review of the district court's orders must begin with the policies underlying Rule 23, the class action mechanism, and the FLSA. *See Coles v. Marsh*, 560 F.2d 186, 189 (3d Cir. 1977) (order restricting communications must be "consistent with the policies of Rule 23"); *Gulf Oil Co.*, 452 U.S. at 102 (order limiting speech must "further[], rather

54

than hinder[], the policies embodied in the Federal Rules of Civil Procedure, especially Rule 23"); *Hoffmann-La Roche*, 493 U.S. at 170 (the benefits of the FLSA "depend on employees receiving accurate and timely notice concerning the pendency of the collective action, so that they can make informed decisions about whether to participate").

As this Court has recognized, "the due process rights of absent class members are important and . . . the district judges who preside over class actions must ensure that those interests are fairly protected." *Radcliffe*, 818 F.3d at 546. Indeed, "the district court has a fiduciary duty to look after the interests of those absent class members." *Allen v. Bedolla*, 787 F.3d 1218, 1223 (9th Cir. 2015). District courts managing class actions must "police[]" the "inherent tensions among class representation, defendant's interests in minimizing the cost of the total settlement package, and class counsel's interest in fees." *Staton v. Boeing Co.*, 327 F.3d 938, 972 n.22 (9th Cir. 2003).

*Coles* and *Gulf Oil*, the two leading cases in this area, both involved restrictions on communications from plaintiffs or their counsel to putative class members. *Gulf Oil Co.*, 452 U.S. at 104; *Coles*, 560 F.2d at 187. In *Gulf Oil*, the Supreme Court was concerned that speech-

limiting orders might "interfere[] with the formation of a class or the prosecution of a class action in accordance with the Rules." *Gulf Oil Co.*, 452 U.S. at 104. Similarly, in *Coles*, the court noted that the restricted communications "were directed toward effectuating the purposes of Rule 23 by encouraging common participation in the litigation . . . ." *Coles*, 560 F.2d at 189. The Court held that any restriction on speech must be "consistent with the policies of Rule 23 . . . ." *Id.* In both cases, the court overturned the restrictions on speech.

This case presents the opposite concern. It is Better's communications themselves, rather than the restriction thereof, that threaten the formation and prosecution of a class under Rule 23. As such, the policies behind Rule 23 and the FLSA support limiting those communications. *See, e.g., Balasanyan*, 2012 WL 760566, at *3; *McKee*, 2018 WL 2422582 at *5.

Indeed, the ability of courts to intervene and address the conduct of counsel and parties is critical in actions arising in the workplace, where "fear of economic retaliation might often operate to induce aggrieved employees quietly to accept substandard conditions." *Mitchell v. Robert DeMario Jewelry, Inc.*, 361 U.S. 288, 296 (1960); *see also*

56

*Kasten v. Saint-Gobain Performance Plastics Corp.*, 563 U.S. 1, 12 (2011) (quoting *Robert DeMario Jewelry*). That fear persists today, "given the fact that case law is replete with examples of FLSA retaliation cases." *Rutti v. Lojack Corp.*, No. SACV-06-350-DOC (JCx), 2012 WL 3151077, at *6 (C.D. Cal. July 31, 2012) (collecting cases). *See also* Milliken, Morrison, Hewlin, *An Exploratory Study of Employee Silence: Issues that Employees Don't Communicate Upward and Why*, Journal of Mgmt. Studies, 40(6), 1453-1476 (2003) ("Fear of retaliation or punishment was raised by 22.5% of our respondents. These individuals worried that if they spoke up they might lose either their job or promotion opportunities.").

Here, the district court's orders conform to (and support) the public policies behind Rule 23 and the FLSA. If this Court determines it has jurisdiction, it should affirm the district court's orders and permit the district court to continue with its orderly management of the litigation.

**B. The District Court did not Abuse its Discretion in Invalidating Some (But Not All) Arbitration Agreements.**

The district court correctly recognized the inherently coercive nature of the employer-employee relationship as a significant factor in Better's agreement blitz. *See* ER-42; *see also Li*, 270 F.R.D. at 517 ("[I]n the context of an employer/worker relationship, there is a particularly acute risk of coercion and abuse when the employer solicits opt-outs from its workers."); *Rutti*, 2012 WL 3151077, at *6 (noting that fear of retaliation dissuades employees from participating in suits against their employers, quoting *Kasten*); *see also Twegbe v. Pharmaca Integrative Pharmacy, Inc.*, No. CV-12-5080-CRB, 2013 WL 3802807, at *6 (N.D. Cal. July 17, 2013) (denying motion to decertify, in part, because "[w]hether or not an employer has actually threatened to retaliate, a class member presented with the opportunity to sue the company signing her paychecks would be reasonable to worry that the adversarial postures adopted in the lawsuit would spill over to the workplace."); *Rees v. Souza's Milk Transp., Co.*, No. CVF0500297-AWI-LJO, 2006 WL 738987, at *9 (E.D. Cal. Mar. 22, 2006) (recommending

58

certification of class, in part because "some of the potential class members are still employed with defendant and are unlikely to institute action against their employer").[15]

---

[15] For similar out-of-Circuit authority, *see, e.g., Mullen v. Treasure Chest Casino, LLC*, 186 F.3d 620, 625 (5th Cir. 1999) (explaining that it is "reasonably presumed" that potential class members still employed by employer "might be unwilling to sue individually or join a suit for fear of retaliation at their jobs"); *Damassia v. Duane Reade, Inc.*, 250 F.R.D. 152, 163 (S.D.N.Y. 2008) ("[E]mployees may feel intimidated about volunteering to participate in an opt-in collective action.") (internal quotations and citation omitted); *Belt v. Emcare Inc.*, 299 F. Supp. 2d 664, 668–69 (E.D. Tex. 2003) (holding that an employer letter to putative class members was coercive because it suggested that the case could affect their employment and it undermined the purpose of collective action by encouraging employees not to join; a brief assurance that the law prohibits retaliation against those who join the suit was not enough to cure the coercive effect); *Bublitz v. E.I. duPont de Nemours and Co.*, 196 F.R.D. 545, 548 (S.D. Iowa 2000) ("Where the defendant is the current employer of putative class members who are at-will employees, the risk of coercion is particularly high; indeed, there may in fact be some inherent coercion in such a situation. This Court is not the first to recognize this."); *Abdallah v. Coca-Cola Co.,* 186 F.R.D. 672, 678 (N.D. Ga. 1999) ("Coca-Cola has not given the Court any reason to suspect that it will attempt to mislead its employees and coerce them into non-participation in this case. But simple reality suggests that the danger of coercion is real and justifies the imposition of limitations on Coca-Cola's communications with potential class members."); *Hampton Hardware, Inc. v. Cotter & Co., Inc.*, 156 F.R.D. 630 (N.D. Tex. 1994) (defendants' three letters to putative class members asking them not to join the lawsuit were an improper attempt to "reduce the class members' participation in the lawsuit based on threats to their pocketbooks").

The imbalance of power played a significant role here because Better's Employment Agreement (which contained the arbitration provision) was mandatory. *See* ER-111. "In essence, the putative class members were told that unless they waived their right to participate in the present action and agree to arbitration, they would be fired." ER-42. As the district court correctly recognized, the "Employment Agreement did not contain any reference to Plaintiff's suit, did not attach Plaintiff's complaint, or provide Plaintiff's counsel's name and contact information. Nor did the appended arbitration agreement (attached as an exhibit) contain such information or include a copy of the complaint." *Id.*

Better argues that its failure to include this essential information in the Employment Agreement should be forgiven because it provided some of the information elsewhere. App.Br. 30. But email correspondence from Better's own Head of People confirms the entire signature blitz was confusing. *See* SER-109 (asking in November, 2020 "is the arbitration the release agreement?"). And Better "offered no evidence that its underwriters were instructed to review the recap

email and Release Agreement prior to signing the Employment Agreement." ER-42.

Better also argues that it did not target putative class and collective members with its arbitration agreement blitz, but that is simply untrue. Better implemented the mandatory Employment Agreements for underwriters in October 2020, immediately after Plaintiff filed suit. ER-135. It did not implement its arbitration program for other employees until months later, in January 2021. ER-135–36. The timing was purposeful; Better sought arbitration agreements from underwriters immediately, before underwriters learned the details of the case or of their opportunity to join, and before the district court began its case management protocols. Better distributed an onslaught of agreements on its underwriters, buttressing the mandatory arbitration agreement with the retention bonus and Release Agreement in hopes of securing multiple signatures and eliminating its exposure before the case got off the ground. And Better misled underwriters by telling them that "all US employees" would be required to sign the Employment Agreement in October 2020, ER-114, when in reality Better saved the non-underwriter arbitration agreements for later.

Moreover, the district court's different treatment of Employment Agreements signed by new hire underwriters reflects a well-considered and tempered exercise of discretion. Plaintiff asked the district court to invalidate all Employment Agreements, but the court refused to invalidate Employment Agreements presented to new hires, reasoning that these employees, having not yet worked for Better at the time they signed the Employment Agreement, were not subject to the same coercion as current employees. ER-46. Although Plaintiff disagrees with the district court, this targeted ruling evidences the district court's careful weighing of the evidence and undermines Better's claim that the district court showed hostility towards arbitration.

In sum, the district court did not abuse its discretion in holding that Better's misleading, confusing, signature-blitz warranted invalidating some (but not all) of the arbitration agreements.

## C. The District Court did not Abuse its Discretion in Invalidating the Release Agreements.

The district court also acted within its discretionary authority in holding that the Release Agreements "were obtained through coercive

or misleading information . . . ." ER-46. In the words of one

Underwriting Manager:

> As for the latter part [Release of claims], I know this is where
> most were lost. I am sure the amount of information you all
> can divulge is limited so it really left most confused on what
> to do….My thoughts are the meeting content should have
> been separated in a way, a high for the RETENTION and then
> onto the required agreements that needed to be signed. The
> OT one should have been totally a silo meeting for sure.

SER-102. Better argues throughout that the Release Agreement was

"voluntary," but the nature of the roll-out left underwriters "confused on

what to do" with the Release Agreement. *Id.* "[K]nowing they had to

forfeit their right to participate in the present action under the

mandatory Arbitration Agreement, employees may have assumed that

they had no option but to accept the Release Agreement if they wanted

to receive any compensation for unpaid wages." ER-43.

Better designed its roll-out not to ensure clarity of communication,

but to maximize signatures and minimize exposure in this case. *See*

SER-95 ("the legals said on Friday they wanted this turned around in a

day…In the first night we got a great rate of return: 1. 72 Release

Returned: 37% response rate. 2. 96 Retention Signed: 45% of eligible

employees. 3. 98 Employment Agreement: 46% of population[.]"); SER-

55 (Better's human resources staff praising the fact that 98 arbitration agreements had been signed by 10:42pm on October 19, 2020 as "Great numbers!" adding "Hopefully with the [recap] email going out this AM we'll have even more responses.").

In addition to the confusing and misleading sequencing of the signature blitz, the district court also identified several misleading aspects of the Release Agreement itself. For example, the description of the lawsuit relied heavily on statutory titles and contained no information about the potential value of employees' claims. ER-43, 45. Better claims employees understood the suit and responded accordingly to it, touting the response from one employee who "disagree[d] with Dominguez's allegations." App.Br. 13. But that underwriter merely confirmed their understanding that Better *classified* underwriters as exempt. ER-157. The employee said nothing of whether their duties satisfied the FLSA's administrative exemption. *See McKeen-Chaplin v. Provident Sav. Bank, FSB*, 862 F.3d 847 (9th Cir. 2017) (underwriters' job duties do not satisfy the administrative exemption to the FLSA's overtime requirements).

Better cites another employee who wrote that the company had been "fair in the overall compensation." ER-122. But again, Plaintiff's case addresses the legality of Better's overtime classification, not the fairness of "the overall compensation." The failure to include information about the nature of Plaintiff's claims makes Better's communications far different than the class settlement process, where employees considering their options may review publicly filed briefing analyzing the strengths and weaknesses of a case.

The district court also correctly recognized that Better failed to include a copy of the complaint, and the website link it provided did not lead to a copy of the complaint for a portion of the relevant time. ER-43.[16] The Release Agreement provides contact information for Plaintiffs' Counsel but also suggests that employees might have to pay for a consultation while admonishing employees not to share the email. ER-45. Since Better was "carefully monitoring employees' access to and viewing of the DocuSign emails," ER-45, employees could have been wary to share the documentation with legal counsel. And the release

---

[16] Better suggests that employees' inability to access the complaint was Plaintiffs' Counsel's fault, but Better is responsible for its own communications.

itself contains contradictory language requiring employees to both assert that they have been paid all wages owed them and also confirm that there is a good faith dispute as to their entitlement to wages. ER-44.

In sum, the record contains ample support for the district court's exercise of its case management duties and corresponding decision to invalidate the Release Agreements. The question on appeal is not whether this Court would reach a different conclusion—indeed, it is entirely possible that another district court would have ruled differently. But the possibility of differing outcomes does not mean that the district court abused its discretion in ruling the way it did. Plaintiff respectfully requests that this Court uphold the district court's discretionary, case-management decisions and return this case to the district court's capable hands for continued litigation.

## D. The District Court did not Abuse its Discretion in Ordering Better to Seek Approval of Communications to Putative Class and Collective Members.

The district court's control over Better's communication with class members is much less restrictive than Better suggests. If Better wants

66

to communicate with its employees about the subject matter of the lawsuit, it is free to seek court approval of that communication. ER-47. To date, Better has not sought district court approval of any specific communications.

The district court acted well within it discretion in imposing this restriction on Better. The district court expended significant judicial resources in reviewing Better's early-suit agreement blitz and adjudicating an appropriate response. It imposed this restriction on Better "to reduce the likelihood that the Court is once again called upon to fashion retrospective relief[.]" ER-46. The district court, having reviewed the extensive record of Better's actions, is in the best position to determine whether Better can be trusted to communicate appropriately with potential class members.

Better devotes little space in its appeal brief to the Court's order regarding its communications—which, coupled with Better's failure to seek approval of any specific communications, confirms that Better views the restriction on speech mostly as an avenue for appellate jurisdiction. In its brief discussion of the issue, Better argues the district court overreached in limiting speech relating to wage and hour

67

matters, instead of just limiting speech relating to this case. App.Br. 46. Although Plaintiff believes the district court acted well within its discretionary authority in imposing this limitation, if this Court believes otherwise it could reverse the district court in part, upholding the limitation on communications regarding the claims at issue in this case but reversing the limitation as to other communications regarding wage and hour matters.

## **CONCLUSION**

This case belongs at the district court, not here on appeal. The Court should dismiss Better's appeal of two interlocutory case management orders for lack of jurisdiction. But if the Court reaches the merits, it should affirm the district court's duty and authority to control communications in Rule 23 class actions and FLSA collective actions, including the duty and authority to invalidate improperly-obtained agreements, and hold that the district court properly exercised that authority here.

Respectfully submitted,

Dated: January 9, 2023     **NICHOLS KASTER, LLP**

s/Matthew C. Helland

Matthew C. Helland, CA Bar No. 250451
Daniel S. Brome, CA Bar No. 278915
235 Montgomery Street, Suite 810
San Francisco, CA 94104
Telephone: (415) 277-7235
helland@nka.com
dbrome@nka.com

*ATTORNEYS FOR PLAINTIFF-
APPELLEE*

## STATEMENT OF RELATED CASES

Plaintiff is not aware of any related cases pursuant to Circuit Rule

28-2.6.

January 9, 2023                           s/Matthew C. Helland
                                          Matthew C. Helland

## **CERTIFICATE OF COMPLIANCE**

1.     This brief complies with the type-volume limitation of Circuit Rule 32-1(a) because it contains 13,252 words, as determined by the word-count function of Microsoft Word for Microsoft 365, excluding the parts of the brief exempted by Federal Rule of Appellate Procedure 32(f).

2.     This brief complies with the typeface requirements of Federal Rule of Appellate Procedure 32(a)(5) and the type style requirements of Federal Rule of Appellate Procedure 32(a)(6) because it has been prepared in a proportionally spaced typeface using Microsoft Word for Microsoft 365 in 14-point Century Schoolbook font.


Dated: January 9, 2022              s/Matthew C. Helland
                                    Matthew C. Helland